IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


DEBRA L. POLLARD                                                         PLAINTIFF


v.                              Civil No. 09-3017


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                          DEFENDANT

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

**I.**      **Factual and Procedural Background**

Plaintiff, Debra L. Pollard, appeals from the decision of the Commissioner of the Social

Security Administration ("Commissioner") denying her applications for disability insurance benefits

("DIB") and supplemental security income ("SSI"), pursuant to §§ 216(i) and 223 of Title II of the

Social Security Act, 42 U.S.C. §§ 416(i) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a,

respectively (collectively, "the Act").

At the time of the alleged onset date, Plaintiff was thirty one years old with an eighth grade

special education.  (Tr. 13, 77).  She performed past relevant work as a shift manager for a pizza

chain and a cashier.  (Tr. 13).  Plaintiff filed her DIB and SSI applications on January 14, 2004,

alleging a disability onset date of October 1, 2001, due to depression, headaches, dizziness,

fibromyalgia, pain and swelling in her lower extremities, arthritis, and back pain.  (Tr. 13, 32, 59-61,

72, 130, 596-98).

Plaintiff's applications were denied at the initial and reconsideration levels.  (Tr. 32-37, 43-

45, 601-03).  At Plaintiff's request, an administrative hearing was held on September 19, 2006.  (Tr.

627-674).  Plaintiff was present at this hearing and represented by counsel.  The Administrative Law

Judge (ALJ) rendered an unfavorable decision on November 24, 2006, finding that Plaintiff was not

disabled within the meaning of the Act because she was capable of performing one or more

occupations existing in significant numbers in the national economy. (Tr. 12-28). Plaintiff

submitted additional evidence to the Appeals Council, which was made a part of the record. (Tr. 6).

Subsequently, the Appeals Council denied Plaintiff's Request for Review on January 16, 2009, thus

making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5). Plaintiff now seeks

judicial review of that decision.

## II.    Applicable Law

The Court's role on review is to determine whether the Commissioner's findings are

supported by substantial evidence in the record as a whole. *Ramirez v. Barnhart*, 292 F.3d 576, 583

(8th Cir. 2003). "Substantial evidence is less than a preponderance, but enough so that a reasonable

mind might accept it as adequate to support a conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th

Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). In determining whether

evidence is substantial, the Court considers both evidence that detracts from the Commissioner's

decision as well as evidence that supports it. *Craig v. Apfel*, 212 F.3d 433, 435-36 (8th Cir. 2000)

(citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)). If, after conducting this review, "it

is possible to draw two inconsistent positions from the evidence and one of those positions

represents the [Secretary's] findings," then the decision must be affirmed. *Cox v. Astrue*, 495 F.3d

614, 617 (8th Cir. 2007) (quoting *Siemers v. Shalala*, 47 F.3d 299, 301 (8th Cir. 1995)).

To be eligible for disability insurance benefits, a claimant has the burden of establishing that

he or she is unable to engage in any substantial gainful activity due to a medically determinable

physical or mental impairment that has lasted, or can be expected to last, for no less than twelve

months.  *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); 42 U.S.C. § 423(d)(1)(A).

The Commissioner applies a five-step sequential evaluation process to all disability claims: (1)

whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe

impairment that significantly limits his physical or mental ability to perform basic work activities;

(3) whether the claimant has an impairment that meets or equals a disabling impairment listed in the

regulations; (4) whether the claimant has the RFC to perform his past relevant work; and (5) if the

claimant cannot perform his past work, the burden of production then shifts to the Commissioner

to prove that there are other jobs in the national economy that the claimant can perform given his or

her age, education, and work experience.  *Pearsall*, 274 F.3d at 1217; 20 C.F.R. § 404.1520(a),

416.920(a).  If a claimant fails to meet the criteria at any step in the evaluation, the process ends and

the claimant is deemed not disabled.  *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir.

2004).

### III.    Medical History

#### A.  Baxter Regional Medical Center

Plaintiff has a lengthy history of treatment at Baxter Regional Medical Center.  Between 2002

and 2006, Plaintiff was seen in the emergency room on numerous occasions for abdominal pain, sore

throat, chest pain, shortness of breath, back pain, headache, and pain, numbness/tingling, and

swelling in her extremities, resulting in the following diagnoses: pharyngitis, otitis (ear infection),

costochondritis (inflammation of the cartilage between the rib and breastbone), gastroesophageal

reflux disease ("GERD"), abdominal and pelvic pain, polyarthralgia (joint pain), benign bone tumor[1],

---

[1] A CT of Plaintiff's chest performed on December 23, 2003 revealed a dense calcified area in the right posterior chest wall, which was diagnosed as a benign bone tumor.  (Tr. 160-61, 421).

inflammatory sinus disease, hypokalemia (low potassium), gallstones[2], cholecystitis, hypertension, constipation, migraine headaches, lower extremity edema, and left hip pain. (Tr. 156-91, 290-314, 341-456, 548-94).

On January 1, 2003, a CT of Plaintiff's head was performed to determine the cause of her headaches. (Tr. 156). The results showed no evidence of intracranial hemorrhage or mass lesion and were otherwise unremarkable. (Tr. 157). A second CT without contrast, performed on November 9, 2005, revealed no gross abnormalities, but noted "rather pronounced atrophy" for a 35-year-old. (Tr. 581). A CT angiography of the brain, performed on May 2, 2006, yielded similarly unremarkable results, although scan quality was not optimal. (Tr. 555).

Plaintiff went to the emergency room on numerous occasions complaining of lower back and hip pain. (Tr. 167, 172-73, 410-11, 312-13). An x-ray of Plaintiff's cervical spine, performed on March 4, 2005, showed good alignment, no definite fractures or subluxations, and no degenerative changes. (Tr. 417). Upon physical examination, Plaintiff was tender over her left paraspinous muscles at L4-L5, but had a negative straight leg raise bilaterally. (Tr. 313, 410). She was diagnosed with acute low back pain and given a shot of Toradol and a prescription for Ultram and Flexeril. (Tr. 410-11). On July 27, 2005, a physical examination revealed good range of motion in both hips and a negative straight leg raise. (Tr. 313). Additionally, on November 19, 2005, x-rays of Plaintiff's hip showed no fracture, dislocation, or large amount of swelling or fluid collection and very minimal degenerative change. (Tr. 577-80). Upon physical examination, Plaintiff had full range of motion

---

[2] After being treated in the emergency room repeatedly for acute abdominal pain, Plaintiff was eventually diagnosed with cholelithiasis (gallstones) and calculous cholecystitis. (Tr. 187, 324-25). Subsequently, on September 9, 2005, Plaintiff had a laparoscopic cholecystectomy and intraoperative cholangiogram performed, which resolved most of her abdominal symptoms. (Tr. 327-28).

in her left hip, including flexion, extension, abduction, adduction, and flexion with external rotation. (Tr. 576-77).  Some point tenderness was noted laterally, but no other abnormalities were observed. (Tr. 577-80).  Plaintiff was diagnosed with acute left hip pain and instructed to take Motrin for pain. (Tr. 580).

      B.  Mountain Home Christian Clinic

Plaintiff began treatment at Mountain Home Christian Clinic in 2003.  Her primary complaints were depression, back and neck pain, headache, numbness/pain in her right arm and shoulder, dizziness, shortness of breath, and trouble sleeping. On March 13, 2003, Plaintiff reported "bad mood swings" for the past year.  (Tr. 198).  She was diagnosed with depression and mood swings, and prescribed Zoloft and Wellbutrin.  (Tr. 198, 489).  A progress note dated May 22, 2003 stated that Plaintiff's depression had improved with medication.  (Tr. 506).  However, in early 2005, Plaintiff's counseling notes reveal that her depression had worsened, as she had "a depressing environment," had experienced weight gain, and felt like her medications were not working as well. (Tr. 490).  Dr. Hagaman recommended that Plaintiff seek counseling in addition to finding a church support group.  (Tr. 489).  On August 4, 2005, Dr. Wilbur noted that Plaintiff "definitely has emotional problems."  (Tr. 486).

Plaintiff also frequently complained of back and neck pain.  On April 24, 2004, Plaintiff was tender in her left neck and shoulder and had diminished range of motion.  (Tr. 501).  On July 8, 2004, after Plaintiff sustained a fall, Dr. Young diagnosed lumbar strain and prescribed Flexeril and Piroxicam.  (Tr. 500).  On August 12, 2004, Dr. Bruton saw Plaintiff for mid-thoracic back pain. (Tr. 499).  Dr. Bruton reported tenderness on the rhomboid muscles bilaterally and opined that, in his opinion, Plaintiff's condition was strictly musculoskeletal in nature.  (Tr. 499).  On January 6,

2005, paraspinal spasms were noted in Plaintiff's back.  (Tr. 495).  On February 17, 2005, it was

noted that Plaintiff had poor overall posture, slumped shoulders, and forward head. (Tr. 519).  Upon

examination, there were no muscular spasms, joint spacing, or spinal rotational anomalies. (Tr. 519).

Plaintiff was assessed with negative postural stability and possible early degenerative disc disease,

and was started on a spinal stabilization and postural strengthening program. (Tr. 519).  On June 15,

2006, Plaintiff presented with back pain and dizziness.  (Tr. 547).  At this time, she was diagnosed

with fibromyalgia syndrome.  (Tr. 547).

C.  Ahrens Clinic

Plaintiff went to the Ahrens Clinic in 2003 and 2004 for bronchitis, sinusitis, depression,

headaches, heartburn, nausea, high blood pressure, and back pain.  She was prescribed Zoloft and

Wellbutrin for depression/smoking cessation, Ativan for anxiety, Topamax for migraines, and

Seroquel for insomnia.  (Tr. 213-23).  On June 14, 2004, Dr. Ahrens noted positive paraspinal

muscle spasms and decreased range of motion in Plaintiff's shoulder, for which he prescribed

Flexeril and ibuprofen. (Tr. 214). On June 28, 2004, Dr. Ahrens reported positive paraspinal muscle

spasms, but a negative straight leg raising test.  (Tr. 213).

D.  Dr. Vann Smith

Plaintiff went to Dr. Smith for a neuropsychological evaluation on February 27, 2004.  When

asked about her symptoms, Plaintiff reported anxiety, depression, headache (one to three times per

week), and a closed head injury as a young child secondary to being "hit by a car."  (Tr. 202).  She

also reported bronchial problems and smoking (one pack per day). (Tr. 202). Plaintiff was oriented

in all spheres, judgment and insight were intact, and memory was mildly impaired.  (Tr. 202).  Her

thought processes were functional to concrete in quality and her narratives were marginally fluent

with occasional word-finding difficulties. (Tr. 202). Dr. Smith found no associational anomaly, hallucinatory or delusional phenomena, or suicidal or homicidal intent, plan, or impulse. (Tr. 203).

On the Wechsler Adult Intelligence Scale, Revised, Plaintiff had a verbal IQ of 81, a performance IQ of 87, and a full-scale IQ of 82, indicating borderline intellectual functioning. (Tr. 203). Dr. Smith diagnosed Plaintiff with organic brain dysfunction, secondary to traumatic brain injury and cognitive dysfunction, non-psychotic, secondary to organic brain syndrome. (Tr. 204). In reaching this diagnosis, Dr. Smith noted "a history of neurocognitive and emotive symptoms including impaired recall memory, impaired attention and concentration, word finding difficulty, sleep pattern disturbance, affective lability, irritability, abulia and dysexecutivism." (Tr. 202). Despite these findings, Dr. Smith gave Plaintiff a global assessment of functioning ("GAF") score of 65, indicating only mild symptoms. (Tr. 205).

In an accompanying Mental RFC Questionnaire dated March 2, 2004, Dr. Smith indicated that Plaintiff could not meet the competitive standards required to perform unskilled work, as she was unable to maintain attention for a two-hour segment, maintain regular attendance and be punctual within customary, usually strict tolerances, sustain an ordinary routine without special supervision, complete a normal work-day and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 209). Dr. Smith further found that Plaintiff was seriously limited in her ability to understand, remember, and carry out short and simple instructions, make simple work-related decisions, respond appropriately to changes in a routine work setting, deal with normal work stress, and be aware of normal hazards and take appropriate precautions. (Tr. 209). Regarding Plaintiff's ability to perform semiskilled and skilled work, Dr. Smith found that Plaintiff was unable to meet

competitive standards, as she could not understand, remember, and carry out detailed instructions and was seriously limited in her ability to deal with the stress of semiskilled and skilled work. (Tr. 209-10). Based on her impairments, Dr. Smith opined that Plaintiff would miss work about four days a month. (Tr. 210).

E. Dr. T. Tweker

In a Treating Physician's Report for Migraine Headache dated August 2, 2004, Dr. Tweker indicated that Plaintiff experienced headaches in her frontal lobe two to three times a week. (Tr. 212). Dr. Tweker reported that Plaintiff took Topamax, which was inadequate, but stated that she did not need narcotic injections. (Tr. 212). When asked to describe any work-related limitations imposed by Plaintiff's headaches, Dr. Tweker simply wrote "incapacitating." (Tr. 212).

F. Dr. Nancy A. Bunting

At the request of the Disability Determination Service ("DDS"), Dr. Bunting evaluated Plaintiff on September 7, 2004. Plaintiff reported completing the eighth grade, with special education classes in math and English. (Tr. 225). When asked about her prior work history, Plaintiff said she "can't work with people" and they "get on her nerves." (Tr. 224). She reportedly attempted suicide twice in 1994, but denied any current suicidal ideation. (Tr. 226). Plaintiff spent most of her time "trying to clean, sitting, and watching TV." (Tr. 226). She could take care of own personal needs, shop by herself, had no problems making change, and could perform household chores. (Tr. 227). She denied any history of being knocked unconscious or receiving blows to the head. (Tr. 227).

Dr. Bunting noted that Plaintiff had memory problems, confusion, disorientation, and word-finding/judgment deficits. (Tr. 226). She exhibited a history of impulsivity and aggression. (Tr.

227).   Pace was slow, concentration was good, and persistence was fair.  (Tr. 228).  Plaintiff

appeared to be open and honest during the interview, but did not answer questions as asked, possibly

due to low intellectual functioning, anxiety/depression, or simply not listening.  (Tr. 228).  Dr.

Bunting diagnosed Plaintiff with intermittent explosive disorder and major depression, and gave

Plaintiff a current GAF score of 55.  (Tr. 227).  Dr. Bunting found two or more areas with significant

limitations in adaptive functioning and opined that Plaintiff was unlikely to improve significantly

over the next twelve months.  (Tr. 227-28).

     G.  Dr. Tammy Tucker

Dr. Tucker, Plaintiff's primary care physician, treated Plaintiff for symptoms associated with

fibromyalgia, depression, headaches, rhinitis, insomnia, shoulder/arm pain, abdominal pain, GERD,

bronchitis, and numbness/tingling and swelling of her legs.  Most notably, on May 5, 2005, Dr.

Tucker saw Plaintiff for a follow-up concerning her depression.  Dr. Tucker noted that Plaintiff was

experiencing sadness, weakness, fatigue, lack of enjoyment of life, sleep disturbances, crying spells,

suicidal ideation but no plan, lethargy, weakness, and weight gain.  (Tr. 615).  She observed

disturbances in Plaintiff's insight/judgment and an overall flat affect.  (Tr. 615).  Dr. Tucker

diagnosed Plaintiff with severe depression and made her an appointment to receive counseling.  (Tr.

615).

     H.  Ozark Counseling Services

Dr. Steve Austin treated Plaintiff for depression.  On June 15, 2005, Dr. Austin noted that

Plaintiff was "kind of vague on her years and dates and things but it may be a result of having some

memory problems along with having a learning disability."  (Tr. 466).  Plaintiff denied auditory and

visual hallucinations as well as suicidal or homicidal ideation.  (Tr. 466).  Her activities consisted

of playing computer games and watching TV.  (Tr. 466).  Dr. Austin noted that her concentration

was erratic, mood was depressed, and she appeared to have some global memory problems.  (Tr.

466).  Plaintiff's affect was sad, her speech was at a regular rate with no pressure, she had no

loosening of associations or racing thoughts, and her insight and judgment were fair. (Tr. 467).  Dr.

Austin diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic

features in Axis I, and dependant personality disorder in Axis II.  (Tr. 468).  He estimated Plaintiff's

GAF score to be 50.  (Tr. 468).  Dr. Austin doubled Plaintiff's prescriptions for Seroquel, Vistaril,

and Zoloft and scheduled a follow-up in one month.  (Tr. 468).

On July 22, 2005, Dr. Austin noted that Plaintiff was doing well on her medications, but

again estimated her GAF score at 50.  (Tr. 469-70).  On September 23, 2005, Plaintiff complained

of increased sleepiness and mood swings.  (Tr. 470).  Dr. Austin increased her prescription for Zoloft

and recommended follow-up in three months.  (Tr. 470).  There is no evidence in the transcript that

Plaintiff continued to see Dr. Austin after this date.

I.  Orthopaedic & Sports Medicine Clinic of Northwest Arkansas

At the ALJ's request, Plaintiff was sent for a consultative orthopedic evaluation, which was

performed by Dr. Alice Martinson on February 14, 2006.  (Tr. 472-77).  Dr. Martinson reported that

Plaintiff had long-standing problems with severe depression and low back pain that radiates into her

abdomen and legs.  (Tr. 472).  Dr. Martinson observed that Plaintiff had a very flat affect with

downcast facial expressions and was unable to maintain eye contact throughout the evaluation.  (Tr.

472).  X-rays taken of Plaintiff's lumbar spine revealed a minimal amount of rotational scoliosis, but

no bony abnormalities or evidence of facet arthropathy.  (Tr. 472-73).  Disc spaces were well

preserved.  (Tr. 472).  Upon physical examination, Plaintiff demonstrated 60 degrees of forward

flexion bringing her fingertips to the level of her distal calves. (Tr. 473). There was no evident

dysrhythmia upon arising, but Plaintiff exhibited pain behavior throughout the exam characterized

by grimacing, grunting, and sighing. (Tr. 473). Plaintiff's seated root test was negative bilaterally,

her straight leg raising was limited to 60 degrees bilaterally by hamstring tightness, and there was

no radiating discomfort below the knee on either side. (Tr. 473). Sensory, motor, and deep tendon

reflex examinations were normal in both lower extremities, peripheral pulses were palpable, and

there was no evidence of thigh or calf atrophy. (Tr. 473). In conclusion, Dr. Martinson stated:

> I believe this woman has no objective evidence of musculo-skeletal or neurologic
> pathology involving her lumbar spine and lower extremities. Her symptoms are most
> likely mechanical in nature associated with her obesity and generally poor physical
> condition. Her primary disabling problem seems to be severe chronic depression.

(Tr. 473).

In an accompanying Physical RFC Assessment, Dr. Martinson found that Plaintiff had the

capacity to lift and/or carry up to 20 pounds frequently and 20 to 50 pounds occasionally and

sit/stand/walk for 8 hours of an 8-hour work-day. (Tr. 477). She further found that Plaintiff could

frequently grasp, handle, perform fine manipulation, feel, push/pull/operate hand and foot controls,

reach, climb, balance, stoop, crouch, kneel, and crawl. (Tr. 477). Additionally, Dr. Martinson found

no environmental or communicative limitations. (Tr. 477).

### J. Baxter Rheumatology Clinic

On April 17, 2006, Plaintiff saw Dr. Safwan Sakr with complaints of body aches, leg pain,

fatigue, poor sleep, and depression. (Tr. 527). Plaintiff reported no peripheral joint swelling and no

prolonged morning stiffness, but did report that she continued to smoke despite a prior attempt to

quit. (Tr. 525-27). Review of system was negative for headaches, numbness/tingling, and memory

loss, although Dr. Sakr noted that Plaintiff looked "listless and depressed." (Tr. 529). Straight leg

raising was within normal limits.  Tinel's and Phalen's signs were negative, as was Schober's test. (Tr. 530).  Dr. Sakr reported no frank synovitis, fair grip and curl in both hands, no swollen or tender peripheral joints, and fair range of motion in all Plaintiff's joints.  (Tr. 530).  He found no clinical evidence for any inflammatory arthritis.  (Tr. 530).  Dr. Sakr did note, however, that Plaintiff demonstrated  tenderness at all 18 trigger points, consistent with a diagnosis of fibromyalgia syndrome.  (Tr. 530).  Dr. Sakr prescribed Cymbalta and recommended aquatic therapy three times a week.  (Tr. 541).  It appears that Plaintiff attended one session of aquatic therapy, but failed to continue treatment due to cost.  (Tr. 541).

As of August 22, 2006, Plaintiff's daily regimen of medications included Topamax, K-tab, Ultram, Cymbalta, Trazodone, Vistaril, Neurontin, Flexeril, Nexium, Motrin, Zomig, Seroquel, Hyosycamine, and Spronolactone.  (Tr. 137).

## IV.    Discussion

The ALJ made the following findings: (1) the claimant has not engaged in substantial gainful activity since the alleged onset date; (2) Plaintiff's impairments are considered "severe;" (3) Plaintiff's medically determinable impairments do not meet or medically equal a listing; (4) Plaintiff's subjective complaints are not entirely credible; (5) Plaintiff retains the RFC to perform a significant range of light work;[3] (6) Plaintiff cannot perform any of her past relevant work; (7) Plaintiff has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case; (8) although Plaintiff's exertional limitations do not allow her to perform the

---

[3] Specifically, the ALJ found that Plaintiff can lift and/or carry 20 pounds occasionally and 10 pounds frequently, and sit, walk, and/or stand for 6 hours in an 8-hour workday.  Due to headaches, she cannot climb scaffolds, ladders, or ropes and cannot work in extreme heat.  From a mental standpoint, Plaintiff can perform work where tasks are simple, require little judgment, are performed by rote with few variables, are not quota-driven, and require only incidental interpersonal contact.  Supervision should be concrete, direct, and specific.  (Tr. 27).

full range of light work, using Medical-Vocational Rule 202.18 as a framework for decision-making and vocational expert ("VE") testimony, there are a significant number of jobs in the national economy that she could perform;[4] and therefore, (9) Plaintiff was not disabled at any point between the alleged onset date and the date of the decision.  (Tr. 26-28).

Plaintiff contends the ALJ erred by: (1) failing to find that her impairments meet or equal a listed impairment; (2) dismissing her subjective complaints; and (3) failing to give proper weight to the opinions of her treating physicians when determining her RFC.  *See* Pl.'s Br. 10-19.

A treating physician's opinion is given controlling weight if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in a clamant's record.  *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009); 20 C.F.R. § 404.1527(d)(2).  The record must be evaluated as a whole to determine whether the treating physician's opinion should be controlling.  *Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005).  A treating physician's evaluation may be disregarded where other medical assessments "are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  *Id.* at 920-21.

Plaintiff's reliance on the "treating physician" rule as applied to Dr. Smith is misplaced.  Dr. Smith evaluated Plaintiff on one occasion.  As such, his opinion is entitled to no greater weight than any other consultative physician.  *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999); *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004) (the assessment of a doctor who evaluates a plaintiff once or not at all does not constitute substantial evidence).  Furthermore, Dr. Smith's opinion that

---

[4] The Plaintiff could perform work as a janitor, which is light, unskilled work.  There are 2,300 of these jobs in Arkansas and 233,216 in the national economy.  (Tr. 27).

Plaintiff is completely disabled due to cognitive dysfunction and organic brain syndrome is inconsistent with his estimated GAF score of 65. (Tr. 205). For these reasons, the ALJ properly evaluated the opinion of Dr. Smith. Nonetheless, we find that remand is necessary on other grounds.

Of particular concern are the ALJ's determinations regarding Plaintiff's fibromyalgia and depression. Plaintiff was treated for fibromyalgia by at least three physicians. (Tr. 530, 547, 616). Her medical records relate a history of chronic back, neck, and hip pain, for which she received Toradol injections and a steady regimen of pain medication, muscle relaxers and NSAIDs, including Ultram, Flexeril, and Piroxicam. (Tr. 173, 214, 269, 410-11, 500-01, 616). These complaints are entirely consistent with the symptoms commonly associated with fibromyalgia: "chronic widespread aching and stiffness, involving particularly the neck, shoulders, back, and hips, which is aggravated by the use of the affected muscles." *Tilley v. Astrue*, 580 F.3d 675, 681 (8th Cir. 2009) (quoting *Stedman's Medical Dictionary* 725 (28th ed. 2006)).

The ALJ noted that Plaintiff exhibited "symptoms consistent with fibromyalgia syndrome" at step two of the sequential analysis. (Tr. 14). However, it does not appear that this diagnosis was considered when evaluating Plaintiff's subjective complaints and determining her RFC. Furthermore, none of the physical RFC assessments in the record address how Plaintiff's fibromyalgia affects her ability to perform certain physical tasks, including operating hand/foot controls, climbing, crouching, kneeling, stooping, and crawling. Fibromyalgia is an elusive diagnosis; "[i]ts cause or causes are unknown, there's no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Tilley*, 580 F.3d at 681 (quoting *Sarchet v. Chater,* 78 F.3d 305, 306 (7th Cir.1996)). Plaintiff's ability to do light housework, take care of her own personal needs, and occasionally shop does not mean she retains "the ability to perform the

requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." *Tilley*, 580 F.3d at 681.  On remand, the ALJ should obtain a physical RFC assessment that addresses any physical limitations resulting from this diagnosis.

We now turn to Plaintiff's diagnosis of depression.  Plaintiff's history of severe depression is well-documented.  Plaintiff has taken numerous anti-depressants, including Zoloft, Wellbutrin, and Trazodone, with little to no improvement in her condition.  Medical records from Dr. Tammy Tucker, Plaintiff's primary care physician, in addition to records from Mountain Home Christian Clinic, reveal that Plaintiff's depression was a major concern.  At Mountain Home Christian Clinic, Plaintiff complained of mood swings and depression.  On April 7, 2005, Dr. Hagaman suggested counseling and finding a church support group to help Plaintiff cope with her symptoms.  (Tr. 489). On May 5, 2005, Dr. Tucker noted that Plaintiff suffered from sadness, weakness, fatigue, lack of enjoyment of life, sleep disturbances, crying spells, suicidal ideation but no plan, lethargy, and weight gain.  (Tr. 615).  Dr. Tucker reported impaired insight/judgment and an overall flat affect. (Tr. 615).  She ultimately concluded that Plaintiff suffered from severe depression with suicidal ideation, recommended counseling, and made Plaintiff an appointment at Ozark Counseling Services.  (Tr. 615).  Even Dr. Martinson, an orthopedic surgeon, stated that Plaintiff's "primary disabling problem seems to be severe chronic depression which has so far not been medically managed."  (Tr. 473).

Dr. Austin, who counseled Plaintiff from June of 2005 until September of 2005, diagnosed Plaintiff with major depressive disorder, recurrent, severe without psychotic features and dependent personality disorder. (Tr. 465-68).  He noted that Plaintiff had erratic concentration, global memory problems, and impaired attention span, possibly due to a learning disability.  (Tr. 466-67).  He

-15-

prescribed Zoloft and Seroquel to treat Plaintiff's symptoms. (Tr. 468). Although Dr. Austin reported that Plaintiff was doing well on her medications, he never estimated her GAF score to be above 50. (Tr. 465-70).

Despite the evidence of Plaintiff's ongoing depression, the ALJ found that Plaintiff could perform work not driven by quotas and where tasks are non-complex with simple instructions, require little judgment, are learned by rote with few variables, and require only occasional interpersonal contact. (Tr. 24-25). In reaching this conclusion, the ALJ relied on the opinion of Dr. Bunting, a consultative physician. (Tr. 23). At no point in her opinion, however, did the ALJ discuss why she afforded more weight to the opinion of a consultative physician and less weight to the opinion of Dr. Austin, Plaintiff's treating psychiatrist. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). This was error. There are no internal inconsistences in Dr. Austin's opinion, nor does it conflict with the medical evidence of record. As such, we must reverse and remand for a proper determination of Plaintiff's mental RFC.

We find that substantial evidence does not support the ALJ's RFC assessment. Upon remand, the ALJ should reassess the opinion of Dr. Austin and take into account Plaintiff's mental health treatment as a whole. Furthermore, the ALJ should obtain a physical RFC assessment that addresses how fibromyalgia affects Plaintiff's ability to perform substantial gainful activity.

## V.    Conclusion

Based on the foregoing, the undersigned recommends reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have <u>fourteen</u> days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1), *amended by* Pub. L. 111-16, §§ 6(1), 7, 123 Stat. 1607, 1608-09 (2009). The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

ENTERED this 19th day of April, 2010.

*/s/ J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE